## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **DORAL DEMUS,** : | |
| : | |
| **Plaintiff,** : | |
| : | |
| v. : | **Case No.:** 2:21-cv-1574 |
| : | |
| **POWER CONTRACTING COMPANY** : | |
| **and VANTAGE CORPORATION,** : | **COMPLAINT IN CIVIL ACTION** |
| : | |
| **Defendant.** : | |
| : | |

Filed on Behalf of Plaintiff:
Doral Demus

Counsel of Record for this Party:
**J.P. WARD & ASSOCIATES, LLC**

Joshua P. Ward
Pa. I.D. No. 320347

J.P. Ward & Associates, LLC
The Rubicon Building
201 South Highland Avenue
Suite 201
Pittsburgh, PA 15206

Telephone:   (412) 545-3015
Fax No.:     (412) 540-3399
E-mail:      jward@jpward.com

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **DORAL DEMUS,** | : |
| | : |
| **Plaintiff,** | : |
| | : |
| v. | : **Case No.:** |
| | : |
| **POWER CONTRACTING COMPANY** | : |
| **and VANTAGE CORPORATION,** | : |
| | : |
| **Defendant.** | : |
| | : |

## COMPLAINT IN CIVIL ACTION

AND NOW, comes Plaintiff, Doral Demus, by and through the undersigned counsel, J.P. Ward & Associates, LLC., and, specifically, Kyle H. Steenland, Esquire, who files the within First Amended Complaint against Defendants, Power Contracting Company and Vantage Corporation, of which the following is a statement:

## PARTIES

1. Plaintiff, Doral Demus (hereinafter "Mr. Demus"), is an adult individual who currently resides at 210 Saint Joseph Street, Pittsburgh, Pennsylvania 15210.

2. Defendants, Power Contracting Company and Vantage Corporation (hereinafter, "Defendants") are collectively one entity with a place of business located at 61 Arch Street, Carnegie, Pennsylvania 15106.

## NATURE OF THE ACTION

3. This action arises under Title VII of the Civil Rights Act of 1964 ("Title VII") 42 U.S.C. § 2000e *et seq.*, the Pennsylvania Human Relations Act ("PHRA") 43 P.S. §§ 951-963, and Section 1981 of the Civil Rights Act of 1866 ("Section 1981") 42 U.S.C. § 1981.

2

## JURISDICTION AND VENUE

4. This Court has jurisdiction over Mr. Demus's discrimination claims pursuant to 28 U.S.C. § 1331.

5. Mr. Demus is a resident and citizen of Pennsylvania, a substantial amount of the events or omissions giving rise to the claims occurred in Western Pennsylvania, and, therefore, this action is within the jurisdiction of the United States District Court for the Western District of Pennsylvania and the venue is proper pursuant to 25 U.S.C. § 1391(b).

6. Mr. Demus filed a timely charge with the Equal Employment Opportunity Commission ("EEOC") regarding his allegations within the purview of the Pennsylvania Human Relations Act ("PHRA") and Title VII of the 1964 Civil Rights Act ("Title VII") on or about June 9, 2021, under case number 533-2021-01469. On August 10, 2021, Mr. Demus was issued a Notice of Suit Rights. A copy of the Notice is attached hereto, made a part thereof, and referenced as "Exhibit A."

## PROCEDURAL HISTORY AND FACTUAL ALLEGATIONS

7. Mr. Demus began his employment with Defendants on or about April 2019.

8. Mr. Demus is a highly qualified African American individual who was hired by Defendants as a driver and laborer.

9. Upon information and belief, Mr. Demus was one of two African American workers employed at his workplace.

10. Upon his initiation of employment, Mr. Demus observed a noose hung in the warehouse.

11. Mr. Demus was extremely shocked and disturbed that to discover such a racially-charged and discriminatory symbol flagrantly was present in the workplace. Mr. Demus

3

subsequently photographed the object. A true and correct copy of the aforementioned photograph is attached hereto, made a part thereof, and referenced as Exhibit "B".

12. Defendants readily walked past the noose and refused to remove the object.

13. The only other African American employee at Mr. Demus's workplace, an electrician named "Lemar" (hereinafter, "Mr. Lemar") subsequently observed and cut down said noose.

14. Upon information and belief, no investigation was ever conducted by Defendants to ascertain who created the object. Furthermore, Defendants, despite their knowledge and awareness of the noose, failed to conduct any remedial measures to ensure that no further racial intimidation or discrimination occurred.

15. Following the above-mentioned incident, Mr. Demus began to notice the disparate treatment he received at his workplace by Defendants.

16. Mr. Demus' Caucasian counterpart Bill Leierzapf, (hereinafter, "Mr. Leierzapf ") regularly used the restroom in the office which was in close proximity to their worksite.

17. Mr. Demus attempted to use the same restroom used by Mr. Leierzapf and was met with disparate treatment by Defendants.

18. When Mr. Demus entered the office building to use the restroom, Mr. Demus's supervisor, Levi Steel, (hereinafter "Mr. Steel") harassed Mr. Demus. At all relevant times, Mr. Steel possessed managerial authority over Mr. Demus for any work completed for Defendants and was an agent of Defendants.

19. On one instance, in which Mr. Demus attempted to use the office restroom, Mr. Steel aggressively questioned Mr. Demus and in a demeaning fashion asked Mr. Demus, "What

are you doing in here?" The context of this statement was that Mr. Demus was not welcome to use the office bathroom.

20. This is in stark contrast to the treatment Mr. Demus's Caucasian counterpart Mr. Leierzapf received. Upon information and belief, and through Mr. Demus' personal observation, Mr. Leierzapf was never aggressively questioned concerning his office bathroom use.

21. Mr. Demus was later directed to use the restroom in the warehouse instead of the office restroom. The restroom in the warehouse was not only less desirable than the office bathroom but also lacked any access to hot water.

22. During the course of his employment, Mr. Demus found a second noose hung in the warehouse. This noose was hung in direct view of many of the managerial staff.

23. Mr. Demus also photographed this noose following the sheer shock and offensiveness of such an object. A true and correct copy of the photograph of the second noose is attached hereto, made a part thereof, and referenced as Exhibit "C".

24. Mr. Demus was once again forced to endure a racially-discriminatory and hostile work environment.

25. Mr. Demus asked management several times to remove the noose and they affirmatively refused to do so.

26. Mr. Demus then asked his Caucasian counterpart, Mr. Leierzapf, to remove the noose, so that he would not be disciplined for doing so himself.

27. Throughout the course of his employment, Mr. Demus never received a raise in compensation. However, Mr. Demus's Caucasian coworker, Mr. Mark, received a raise despite possessing less seniority than Mr. Demus.

28. Further, Mr. Mark worked for Defendants for a shorter period of time than Mr. Demus.

29. Mr. Demus asked Defendants several times about this discrepancy, and Defendants, by and through Mr. Steel, refused to address or remedy the pay disparity between the two employees.

30. Additionally, Mr. Steel refused to have a formal meeting with Mr. Demus regarding the pay disparity.

31. Furthermore, Mr. Demus' similarly situated Caucasian coworkers, including those on his specific team, received a company gas card. Mr. Demus, however, was denied one.

32. Upon information and belief, Mr. Demus was denied the benefit of a company gas card because of his race.

33. While Mr. Demus's Caucasian coworkers were allowed to take their gas cards home, Mr. Demus was told he must ask his coworker, Mr. Leierzapf, for Mr. Leierzapf's gas card if a situation warranted its use.

34. It should be noted that Mr. Leierzapf was provided a gas card even though Mr. Leierzapf's workplace duties did not include driving, whereas Mr. Demus's workplace duties consisted of driving company vehicles.

35. Mr. Demus further noticed that he was often watched and supervised by Mr. Leierzapf and Mr. Steel while he performed tasks.

36. When Mr. Demus asked Mr. Leierzapf why they watched him, Mr. Leierzapf explained that Mr. Steel had directed Mr. Leierzapf to "keep an eye on [Mr. Demus]."

37.     It should be noted that Mr. Leierzapf did not have any managerial authority and was a similarly situated employee to Mr. Demus from a hierarchical and organizational perspective.

38.     On or about October of 2020, Mr. Demus was interrupted by Mr. Steel while he operated a forklift.

39.     Mr. Steel approached Mr. Demus and stated, "Hey, I'm going to work you like a n****r dog. You ever hear that saying?" Mr. Demus immediately protested this hostile and racially derogatory and discriminatory statement.

40.     Mr. Steel proceeded to issue a work-related order to Mr. Demus and then immediately left the premises.

41.     Upon information and belief, Mr. Steel then conferred with Mr. Mark and informed Mr. Mark of what Mr. Steel said to Mr. Demus.

42.     Mr. Mark then approached Mr. Demus. Mr. Mark stated that Mr. Steel conveyed, in a bragging fashion, to Mr. Mark that Mr. Demus was "angry" with Mr. Steel.

43.     Mr. Mark further stated that Mr. Steel informed Mr. Mark of the details concerning the racially discriminatory, intimidating, and hostile statements Mr. Steel made to Mr. Demus.

44.     Immediately following this incident, Mr. Demus reported the derogatory comment to another supervisor, "Joe T." (hereinafter "Mr. T"). Mr. T acknowledged the report and brought the comment to his superior, "Dave," (hereinafter, "Mr. Dave").

45.     Upon information and belief, Mr. Dave oversaw the laborers at Defendants. Upon learning of the comment, Mr. Dave called Mr. Steel and Mr. T into his office for a meeting wherein Mr. Steel admitted to making the statement in its entirety.

46. Upon information and belief, Mr. Steel apologized for his comment to his superiors. Defendants took no further steps to address this behavior or remedy the racially discriminatory hostile work environment.

47. Mr. Demus was not invited to attend the above-mentioned meeting with management.

48. Mr. Steel approached Mr. Demus following the meeting and indicated that he "did not mean [the comment] that way."

49. The racially derogatory incident became a well-known topic to all employees who worked for Defendants. Mr. Demus's coworkers regularly mentioned the incident to him, forcing Mr. Demus to regularly re-live the incident.

50. The human resources department, including the former human resources representative, Kerri and the new representative, Annabelle, were both aware of the incident, however no representative from the department reached out to Mr. Demus to address or remedy the discriminatory treatment.

51. Furthermore, no sensitivity training was conducted, nor was Mr. Steel disciplined in any way for his racially derogatory comment and harassing behavior.

52. On or about November 3, 2020, Mr. Demus suffered a heart attack while working for Defendants. This heart attack was induced in part following the stress Mr. Demus experienced because of the above racially discriminatory comments and the racially discriminatory hostile work environment.

53. Mr. Demus was put under the care of his physician and placed on medical leave on or about the same date.

54. Mr. Demus was released to return to work by his physician on or about February 8, 2021. A true and correct copy of the note from Mr. Demus's physician is attached hereto, made a part thereof, and referenced as Exhibit "D".

55. Upon obtaining clearance from his physician to return to work, Mr. Demus contacted Mr. Steel, via text message, and informed him that he planned to return to work the following day. A true and correct copy of the text message correspondence is attached hereto, made a part thereof, and referenced as Exhibit "E".

56. It should be noted that Mr. Steel was the supervisor imbued with the authority to hire and fire individuals for Defendants.

57. On or about February 7, 2021, Mr. Steel responded to Mr. Demus's text message and stated, "We're kind of slow, just go ahead and collect [unemployment benefits.]" See Exhibit "E".

58. On or about May 6, 2021, Mr. Demus received a notice from his health insurance company which stated that his benefits had been exhausted on or about April of 2021 due to non-employment. Prior to the receipt of this paperwork, Mr. Demus was unaware that his employment had been formally terminated. A true and correct copy of the health insurance paperwork is attached hereto, made a part thereof, and referenced as Exhibit "F".

59. Following his termination, while browsing the hiring website, "Indeed," Mr. Demus viewed his identical position in a hiring advertisement from Defendants. Moreover, upon information and belief, following Mr. Demus' termination, Mr. Steel hired two Caucasian employees to replace Mr. Demus. A true and correct copy of the Indeed hiring advertisement is attached hereto, made a part thereof, and referenced as Exhibit "G".

60. As a direct and proximate cause of the aforementioned conduct, Mr. Demus suffered actual damages, including, but not limited to, wage loss, loss of income, and emotional distress damages, all in the past, present and future.

61. As set forth hereinabove, Defendants' actions were intentional, knowing, wanton, willful, and so outrageous as to shock the conscience

## COUNT I
## RACIAL DISCRIMINATION IN
## VIOLATION OF SECTION 1981

62. Mr. Demus incorporates the allegations contained in the paragraphs above as if fully set forth at length herein.

63. 42 U.S.C. § 1981(a) provides that:

> "[a]ll persons within the jurisdiction of the United States shall have the same right … to <u>make and enforce contracts</u>, to sue, be parties, give evidence, and to the full and equal benefit of all laws …as is enjoyed by white citizens."

*Johnson v. Ry. Exp. Agency, Inc.*, 421 U.S. 454, 460 (1975) (holding that Section 1981 "affords a federal remedy against discrimination in private employment on the basis of race."); see also, *Comcast Corp. v. Natl. Assn. of African Am.-Owned Media*, 140 S. Ct. 1009, 1010 (2020).

64. Thus, Section 1981 prohibits employers from engaging in intentional racial discrimination.

65. Mr. Demus experienced racial discrimination in various ways. This discrimination included, but was not limited to, disparate treatment, disparate compensation, a racially hostile work environment, and ultimately, termination from employment.

66. Defendants subjected Mr. Demus to the above-mentioned adverse employment actions, and not his Caucasian counterparts. Therefore, Defendants deprived Mr. Demus of the full and equal benefit of all laws as is enjoyed by white citizens, in direct violation of Section 1981.

67. Defendants subjected Mr. Demus to the adverse employment actions because of his race, and therefore deprived him the same right to make and enforce contracts as is enjoyed by white citizens, in direction violation of Section 1981.

68. Defendant's actions against Mr. Demus were undertaken with wanton, willful and reckless indifference to Mr. Demus's federally protected right to make and enforce contracts regardless of his race.

69. As a direct and proximate result of the aforementioned conduct, Mr. Demus suffered actual damages, including, but not limited to, lost wages, benefits, emotional distress, anxiety, loss of reputation, loss of professional opportunities, humiliation and severe inconvenience all in the past present and future.

WHEREFORE, Plaintiff, Mr. Demus, hereby requests this Honorable Court consider the above and grant relief in his favor. Specifically, Plaintiff requests this Court award him back pay, front pay, any other compensatory and punitive damages as calculated by the Court, pre-judgment and continuing interest as calculated by the Court, costs, and reasonable attorney's fees.

## COUNT II
## HOSTILE WORK ENVIRONMENT IN
## VIOLATION OF SECTION 1981

70. Mr. Demus incorporates the allegations contained in the paragraphs, above, as if fully set forth at length herein.

71. To establish a § 1981 claim alleging a hostile work environment based on race, a plaintiff must show that: "(1) the employee suffered intentional discrimination because of his/her race, (2) the discrimination was severe or pervasive, (3) the discrimination detrimentally affected the plaintiff, (4) the discrimination would detrimentally affect a reasonable person in like circumstances, and (5) the existence of respondeat superior liability, meaning the employer is responsible." *Castleberry v. STI Group*, 863 F.3d 259, 263 (3d Cir. 2017)

72. Mr. Demus faced intentionally discriminatory treatment in the form of disparate treatment and a racially hostile work environment, throughout his employment.

73. The above-mentioned hostile work environment included, but was not limited to, disparate treatment, disparate pay, nooses in the workplace, Mr. Steel's use of racially charged language, failure to discipline Mr. Steel following Mr. Demus's report of the language, and ultimately, termination from employment.

74. Defendants retaliated against Mr. Demus, following his report of the hostile work environment, by not allowing Mr. Demus to return to work after his medical leave, and replacing Mr. Demus with Caucasian employees.

75. Therefore, Defendants permitted, condoned, and perpetuated the racially hostile work environment which Mr. Demus was forced to endure, and therefore deprived him of the same right to make and enforce contracts as is enjoyed by white citizens, in violation of the Civil Rights Act of 1866, 42 U.S.C. §1981.

76. Defendants' actions against Mr. Demus were undertaken with reckless indifference to Mr. Demus's federally protected right to make and enforce contracts irrespective of his race.

77. As a result of Defendants' race discrimination against Mr. Demus, Mr. Demus has suffered and continues to suffer damages, including but not limited to lost wages and benefits, anxiety, loss of reputation, lost career opportunities, emotional distress, humiliation and inconvenience.

WHEREFORE, Plaintiff, Mr. Demus, hereby requests this Honorable Court consider the above and grant relief in his favor. Specifically, Plaintiff requests this Court award him back pay, front pay, any other compensatory and punitive damages as calculated by the Court, pre-judgment and continuing interest as calculated by the Court, costs, and reasonable attorney's fees.

**COUNT III**
**RACIAL DISCRIMINATION IN VIOLATION**
**OF TITLE VII AND THE PHRA**

78. Mr. Demus incorporates the allegations contained in the paragraphs, above, as if fully set forth at length herein.

79. Under Title VII, it is illegal for an employer to "fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin." 42 U.S.C.A. §2000e-2(a)(1).

80. When analyzing a claim of discrimination under Title VII, a plaintiff must show: "(1) he is a member of a protected class; (2) he was qualified for the position he sought to attain or retain; (3) he suffered an adverse employment action; and (4) either similarly-situated non-members of the protected class were treated more favorably or the action occurred under circumstances that could give rise to an inference of intentional discrimination." *Langley v. Merck & Co.*, 186 Fed Appx. 258 (3d Cir. 2006) (citing *McDonnell Douglas Corp. v. Green*, 36 L. E.D. 29 668 (1973). See also *Makky v. Chertoff*, 542 F.3d 205, 214 (3d Cir. 2008).

81. The same legal standards apply to Title VII and PHRA claims. *Connelly v. LaneConstr. Corp.*, 809 F.3d 780, 791 (3d Cir. 2016) (citing *Goosby v. Johnson & Johnson Med., Inc.*, 228 F.3d 313, 317 (3d Cir. 2000)). Further, the same standards apply to claims under Title VII and the PHRA on a summary judgment motion. *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410 (3d Cir. 1999). Accordingly, the Court's analysis of the Title VII claims also applies to the PHRA claims. *Phillips v. Septa*, CIVIL ACTION NO. 16-0986, 6-7 (E.D. Pa. Feb. 12, 2018).

82. Pennsylvania courts have determined that an adverse employment action is "an action by an employer that is serious and tangible enough to alter an employee's compensation,

terms, conditions, or privileges of employment." *Jones v. SEPTA*, 796 F.3d 323, 326 (3d Cir. 2015) (quoting *Storey v. Burns Int'l Sec. Serv.*, 390 F.3d 760, 764 (3d Cir. 2004)).

83. Under Title VII, for other employees to be considered "similarly situated," they must have "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Morales v. Pnc Bank, N.A.*, 2012 U.S. Dist. LEXIS 143605 *23 (E.D. Pa. 2012).

84. Pennsylvania courts have held that comparison factors for "similarly situated employees" have included "dealing with the same supervisor, having been subject to the same standards, and engaging in the same conduct without differentiating and mitigating circumstances." *Id*.

85. A plaintiff may also satisfy the fourth element by "showing other circumstances that give rise to an inference of unlawful discrimination." *Senador v. Zober Indus.*, 2009 U.S. Dist. LEXIS 36059 *9 (E.D. Pa. 2009).

86. Mr. Demus was an African American employee who worked for Defendants and was regarded in a fashion that was different from his Caucasian counterparts.

87. Mr. Demus was qualified for his position and performed the duties of his position satisfactorily.

88. Mr. Demus faced discriminatory treatment in the form of a racially discriminatory culture and hostile work environment perpetuated by Defendants.

89. This racially discriminatory environment included, but was not limited to, disparate treatment, disparate pay, nooses in the workplace, Mr. Steel's use of racially charged language, failure to discipline Mr. Steel following Mr. Demus's report of the language, and ultimately, termination from employment.

90. Further, Mr. Demus was terminated in retaliation of his reports of racial discrimination and upon information and belief, was replaced with Caucasian employees.

91. As a direct and proximate cause of the aforementioned conduct, Mr. Demus suffered actual damages, including, but not limited to, wage loss, loss of income, and emotional distress damages, all in the past, present and future.

92. As set forth hereinabove, Defendants' actions were intentional, knowing, wanton, willful, and so outrageous as to shock the conscience.

WHEREFORE, Plaintiff, Mr. Demus, hereby requests this Honorable Court consider the above and grant relief in his favor. Specifically, Plaintiff requests this Court award him back pay, front pay, any other compensatory and punitive damages as calculated by the Court, pre-judgment and continuing interest as calculated by the Court, costs, and reasonable attorney's fees.

## COUNT IV
## HOSTILE WORK ENVIRONMENT IN VIOLATION
## OF TITLE VII AND THE PHRA

93. Mr. Demus incorporates the allegations contained in the paragraphs, above, as if fully set forth at length herein.

94. The protections established by Title VII include "protection against a hostile work environment that is abusive to an employee on the basis of his or her race." *Bryant v. Wilkes-Barre Hops., Co., LLC*, 146 F. Supp. 3d 628, 645 (M.D. Pa. 2015).

95. In order to establish a hostile work environment claim, a plaintiff must show that: "(1) he suffered intentional discrimination because of race and/or national origin; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same protected class

in that position; and (5) the existence of vicarious or respondent superior liability." *Senador* at *25 (citing *Cardenas v. Massey*, 269 F.3d 251, 260 (3d Cir. 2001)).

96. The analytical framework used to evaluate a claim under the PHRA is effectively indistinguishable from that under Title VII. See *Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 409 (3d Cir. 1999).

97. Because Complainant is able to state a prime facie case for race discrimination and hostile work environment under Title VII, so too will he be able to state such a claim under the PHRA.

98. The United States Supreme Court "has held that when the workplace is permeated with discriminatory intimidation, ridicule, and insult, that it is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII . . . is violated." *Washington v. Martinez*, 2004 U.S. Dist. LEXIS 4325 at *16 - *17 (E.D. Pa. 2004).

99. Courts have held that "whether an environment is 'hostile' or 'abusive' can be determined only by looking at all of the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Washington* at *17 - *18 (quoting *Harris v. Forklift Sys.*, 510 U.S. 17, 22 (1993)).

100. Conditions that create a hostile working environment "may constitute a significant change in benefits and establish the adverse action necessary to state a prima facie case of discrimination." *Washington* at *17.

101. Mr. Demus faced a hostile work environment in the form of racially discriminatory treatment, culture and environment throughout his employment.

102. The above-mentioned hostile work environment included, but was not limited to, disparate treatment, disparate pay, nooses in the workplace, Mr. Steel's use of racially charged language, failure to discipline Mr. Steel following Mr. Demus's report of the language, and ultimately, termination from employment.

103. Defendants retaliated against Mr. Demus, following his report of the hostile work environment, by not allowing Mr. Demus to return to work after his medical leave, and replacing Mr. Demus with Caucasian employees.

104. Therefore, Defendants permitted, condoned, and perpetuated the racially hostile work environment to which Mr. Demus was forced to endure.

105. As a direct and proximate cause of the aforementioned conduct, Mr. Demus suffered actual damages, including, but not limited to, wage loss, loss of income, and emotional distress damages, all in the past, present and future.

106. As set forth hereinabove, Defendants' actions were intentional, knowing, wanton, willful, and so outrageous as to shock the conscience.

WHEREFORE, Plaintiff, Mr. Demus, hereby requests this Honorable Court consider the above and grant relief in his favor. Specifically, Plaintiff requests this Court award him back pay, front pay, any other compensatory and punitive damages as calculated by the Court, pre-judgment and continuing interest as calculated by the Court, costs, and reasonable attorney's fees.

## COUNT V
## RETALIATION IN VIOLATION
## OF TITLE VII AND THE PHRA

107. Mr. Demus incorporates the allegations contained in the paragraphs, above, as if fully set forth at length herein.

108. To establish a prima facie case of retaliation under Title VII, a plaintiff must provide evidence that: (1) he "engaged in activity protected by Title VII"; (2) the employer took an "adverse employment action" against him; and (3) there was a "causal connection" between his "participation in the protected activity and the adverse employment action." *Kengerski v. Allegheny Cty.*, 435 F. Supp. 3d 671, 676 (W.D. Pa. 2020) (citing to *Moore v. City of Philadelphia*, 461 F.3d 331, 341-42 (3d Cir. 2006); See also, *Nelson v. Upsala Coll.*, 51 F.3d 383, 386 (3d Cir. 1995)).

109. The analytical framework used to evaluate a claim under the PHRA is effectively indistinguishable from that under Title VII. See *Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 409 (3d Cir. 1999).

110. Pennsylvania courts have determined that an adverse employment action is "an action by an employer that is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." *Jones v. SEPTA*, 796 F.3d 323, 326 (3d Cir. 2015) (quoting *Storey v. Burns Int'l Sec. Serv.*, 390 F.3d 760, 764 (3d Cir. 2004)).

111. "When the temporal proximity between the protected activity and adverse action is unduly suggestive, this is sufficient standing alone to create an inference of causality…" *Lichtenstein v. University of Pittsburgh Medical Center* 691 F.3d 294, at 307 (3d Cir.2012), citing *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 (3rd Cir.2007).

112. Mr. Demus engaged in an activity protected by Title VII by reporting the racially hostile work environment he endured at his workplace.

113. Despite Mr. Demus's reports, no corrective action was taken.

114. Instead, Defendants refused to allow Mr. Demus to return to work following his release from medical leave and replaced him with Caucasian employees.

115. As a direct and proximate cause of the aforementioned conduct, Mr. Demus suffered actual damages, including, but not limited to, wage loss, loss of income, and emotional distress damages, all in the past, present and future.

116. As set forth hereinabove, Defendant's actions were intentional, knowing, wanton, willful, and so outrageous as to shock the conscience.

WHEREFORE, Plaintiff, Mr. Demus, hereby requests this Honorable Court consider the above and grant relief in his favor. Specifically, Mr. Demus requests this Court award him back pay, front pay, any other compensatory and punitive damages as calculated by the Court, pre-judgment and continuing interest as calculated by the Court, costs, and reasonable attorney's fees.

Respectfully submitted,

**J.P. WARD & ASSOCIATES, LLC**

Date: November 2, 2021

By: */s/ Kyle H. Steenland*
Joshua P. Ward (Pa. I.D. No. 320347)
Kyle H. Steenland (Pa. I.D. No. 327786)

J.P. Ward & Associates, LLC
The Rubicon Building
201 South Highland Avenue
Suite 201
Pittsburgh, PA 15206

Counsel for Plaintiff